IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON AUGUSTINE HEREDIA, | No. 2:10-CV-0693-GEB-CMK-P |
| Petitioner, | |
| vs. | FINDINGS AND RECOMMENDATIONS |
| MICHAEL MARTEL, | |
| Respondent. | |
| _____/ | |

Petitioner, a state prisoner proceeding with retained counsel, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Pending before the court are petitioner's amended petition for a writ of habeas corpus (Doc. 42), respondent's answer (Doc. 43), and petitioner's reply (Doc. 51).

///
///
///
///
///
///

1

# I. BACKGROUND

A. **Facts**[1]

The state court recited the following facts, and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

> Bridgette Alvarez and her daughter Alexis were often homeless.  In August 2003, Alvarez gave temporary guardianship of her daughter to Heredia, a man who lived (with his wife and two young children) next door to her father.  On the afternoon of October 23, 2003, Alexis suffered severe injuries while she was at home with Heredia and his children.  She was transported to Kaiser Hospital in Vallejo and then to Children's Hospital in Oakland, but she died of her injuries the following day.
> A felony complaint was filed against Heredia on October 29, 2003, and, after a preliminary hearing, he was charged with murder (Pen. Code, § 187, subd. (a)) and assault on a child under age eight causing death (Pen. Code, § 273ab).  The matter proceeded to a trial, but the jury could not reach a verdict on either count.  Heredia's second jury trial commenced on June 30, 2005.

The state court then recited the following outline of the prosecutions' case:

> Alvarez testified that Stacey Jolly, a friend of hers, first suggested that she give custody of Alexis to someone else.  She then spoke with Heredia on the phone two or three times, and he agreed to take Alexis.  Alvarez had often seen Heredia with his children, and she believed he was a good father to them.  No mention was made about whether Heredia's wife would help care for the girl.
> Several witnesses testified that Alexis was a normal child and not especially clumsy.  She was potty-trained, and she always preferred to take baths instead of showers.  Alvarez said the child refused to take showers because she did not like the water hitting her in the face.  Alvarez and Alexis stayed at the home of Alvarez's friend Dana Bidou the night before Alexis went to live with Heredia.  Bidou saw Alexis in her underwear before her mother bathed her that night, and she observed no bruising or other marks on the child.  Alvarez's sister saw Alexis the next day, i.e., the day she left to live with Heredia, and she also noticed no marks or bruises on the child's body.  Alvarez and her sister last saw Alexis in the middle of September.  The child was asleep in Heredia's truck, and her hair had been shaved off.  Alvarez did not notice any marks on the girl, but Alexis was wearing long sleeves and pants.  Alexis appeared sad and cried some.

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct."  Petitioner bears the burden of rebutting this presumption by clear and convincing evidence.  See id.  These facts are, therefore, drawn from the state court's opinion(s), lodged in this court.  Petitioner may also be referred to as "defendant."

|   |   |
|---|---|
| 1 | About a month after Alexis had moved into Heredia's home, she stayed with his sister-on-law, Quinn Steadman, for two weeks while Heredia and his wife took a trip to Florida.  Steadman became concerned because Alexis's physical well-being seemed to be deteriorating, and she called Child Protective Services (CPS) to seek help.  Alexis's mental state was different from that of any other child Steadman had seen or cared for.  She could not remember Steadman's name or how to perform daily functions such as routines for personal hygiene.  Steadman noticed Alexis was clumsy "at times" and urinated erratically – sometimes holding her urine all day, sometimes urinating several times throughout the day.  Alexis also behaved strangely with food, consuming her meals rapidly as if there would not be another opportunity to eat.  She bruised easily, and Steadman noticed several bruises on her body and significant redness in her crotch area.  Weeks earlier, shortly after Alexis was placed in Heredia's care, Steadman had observed burn marks on the girl's ankles.  Alexis had also suffered a broken nose, and Heredia told Steadman it happened because Alexis fell while taking a shower.  However, Steadman bathed Alexis and confirmed that the child was terrified of showers.  Steadman told CPS about the broken nose and bruising she saw on Alexis's legs and back and a knot Alexis had on the back of her head.  Although Heredia had told Steadman that Alexis was clumsy, the child did not fall or have any accidents while in Steadman's care.  Although Steadman told CPS she thought Heredia's family was physically abusing Alexis, she testified that she said this because she believed it was the only way to get CPS involved.  She believed Alexis needed professional help, and she wanted to do whatever was necessary to get the child taken away from her sister and Heredia because, given problems the couple was going through, she did not think they could give Alexis that help. |

About a month after Alexis had moved into Heredia's home, she stayed with his sister-on-law, Quinn Steadman, for two weeks while Heredia and his wife took a trip to Florida. Steadman became concerned because Alexis's physical well-being seemed to be deteriorating, and she called Child Protective Services (CPS) to seek help. Alexis's mental state was different from that of any other child Steadman had seen or cared for. She could not remember Steadman's name or how to perform daily functions such as routines for personal hygiene. Steadman noticed Alexis was clumsy "at times" and urinated erratically – sometimes holding her urine all day, sometimes urinating several times throughout the day. Alexis also behaved strangely with food, consuming her meals rapidly as if there would not be another opportunity to eat. She bruised easily, and Steadman noticed several bruises on her body and significant redness in her crotch area. Weeks earlier, shortly after Alexis was placed in Heredia's care, Steadman had observed burn marks on the girl's ankles. Alexis had also suffered a broken nose, and Heredia told Steadman it happened because Alexis fell while taking a shower. However, Steadman bathed Alexis and confirmed that the child was terrified of showers. Steadman told CPS about the broken nose and bruising she saw on Alexis's legs and back and a knot Alexis had on the back of her head. Although Heredia had told Steadman that Alexis was clumsy, the child did not fall or have any accidents while in Steadman's care. Although Steadman told CPS she thought Heredia's family was physically abusing Alexis, she testified that she said this because she believed it was the only way to get CPS involved. She believed Alexis needed professional help, and she wanted to do whatever was necessary to get the child taken away from her sister and Heredia because, given problems the couple was going through, she did not think they could give Alexis that help.

Around 3:30 in the afternoon on October 23, 2003, Heredia's next-door neighbor Earl Grimm was home alone when he heard the sound of a child crying.  After about five to seven seconds of crying, Grimm heard a loud crash like a heavy glass or a vase breaking, followed by a single scream and then silence.  Concerned, Grimm looked out his window up and down the street, but he saw no one outside.  Around 4:15 p.m., paramedics arrived at Heredia's house in response to a 911 call.  Heredia and two young children were there, and Alexis was lying on the floor, flat on her back and motionless.  She was not responsive to any stimulation, was not breathing, and had no pulse.  A paramedic started CPR and brought Alexis into the ambulance.  Heredia asked where they were taking Alexis but asked no other questions and did not accompany the paramedics to the hospital.

Dr. Harold Farber, a pediatrics expert who treated Alexis at Kaiser Hospital, testified that she arrived with multiple bruises on her scalp, ears, nose, buttock and thighs, which are not typical areas of child bruising.  Her pupils were fixed and non-reactive, indicating she had a severe brain injury.  After Alexis was resuscitated, the medical staff prepared her for immediate helicopter transport to the neurosurgical center at Children's Hospital in Oakland.  Based on his experience in dealing with cases of suspected child abuse, Dr. Farber testified Alexis's injuries appeared consistent with "non-accidental trauma."

3

Dr. Thomas Reid treated Alexis when she arrived at the intensive care unit of Children's Hospital. When Alexis arrived at Children's, she had unstable blood pressure, could not breathe on her own, and was on life support. Dr. Reid could not detect any sign of brain function in her. He recorded bruises on both sides of her forehead, a bruise between her right eye and ear, a bruise on her right upper eyelid, several small bruises inside and outside her left ear, bruises on the outside of both thighs, and a squishy lump the size of a silver dollar above her right ear. Dr. Reid explained that blunt force trauma occurs when the head is hit with something solid, like a fist or baseball bat, that does not penetrate the skin. The impact causes the brain to swell, and this swelling ultimately leads to death. A CT scan performed on Alexis's brain demonstrated that she had such swelling, and swelling was consistent with her other symptoms on examination. Alexis was given the diuretic drug mannitol in an effort to reduce the brain swelling. However, Dr. Reid did not expect Alexis to survive because, as a result of the swelling, she had no detectable brain function. He had no doubt that Alexis had been inflicted with head trauma and no doubt that the head trauma was caused by child abuse. Analysis of Alexis's blood indicated that she had an abnormality in blood coagulation (known as "DIC") that could cause excessive bruising, but Dr. Reid explained this condition is very common after a severe injury. Although DIC can have other causes, it is a condition induced indirectly by trauma, and Dr. Reid attributed the DIC observed in Alexis to her head injury.

Dr. James Crawford, a pediatrician specializing in child abuse, also examined Alexis while she was at Children's Hospital. He documented extensive bruising in the same areas described by Dr. Reid and a large area of swelling on the scalp. Dr. Crawford testified these were not "normal scrapes and bruises" such as one might see on any four-year-old. Accidental lesions typically occur on the front of the body and over body areas like the elbows, knees, and shins. The mount of bruising on Alexis was "clearly far in excess of anything that's normal," and the lesions on her head and buttocks were particularly indicative of physical assault. Dr. Crawford had no doubt in his mind that Alexis had been severely beaten. Moreover, the presence of a bruise indicates a relatively recent injury, because bruises typically last only a week, or slightly longer. Like Dr. Reid, Dr. Crawford explained that DIC is caused by a catastrophic injury or trauma to the body. However, Crawford noted that Alexis's blood coagulation studies at Children's did not suggest she had DIC, and he did not believe the extensive bruising on her body was caused or heightened by DIC. He testified that Alexis died from a traumatic brain injury, which was evidenced by cerebral edema (i.e., brain swelling) and the bleeding that was present between her brain and skull.

Forensic pathologist Arnold Josselson performed an autopsy on Alexis's body on October 24, 2003. Dr. Josselson noted the presence of numerous bruises of varying ages, and he testified that such bruising was "almost always due to child abuse" and could not have occurred from a fall off of a bed. The area above Alexis's right ear appeared grossly swollen, and Dr. Josselson found widespread bleeding between the scalp and skull, indicating "a rather marked blunt force injury applied to the head." Inside the skull, there was another large hemorrhage in the area between the brain and the dura (i.e., the membrane that covers the brain),

and additional small areas of hemorrhage were found on the surface of the brain itself.  Dr. Josselson testified that all of these findings were consistent with blunt force head injury, and he concluded this was the cause of Alexis's death.  Dr. Josselson explained that children who suffer head injuries of this type usually die as a result of brain swelling, and such swelling was documented in films taken when Alexis was admitted to Children's Hospital.  Although the brain was not swollen at the time of autopsy, Dr. Josselson believed there were two reasons why.  First, while treating Alexis, doctors administered the drug mannitol, which reduces brain swelling.  Second, the swelling in Alexis's brain caused a compression of the pituitary gland and led her to develop diabetes insipidus, something Dr. Josselson observed often happens in children.  When the pituitary gland is squeezed from the brain swelling, it stops producing a hormone that causes the body to retain water.  Without this hormone, the patient loses a high volume of water through urination, and hospital records indicate this is what happened to Alexis.  Dr. Josselson found no injury to the neck upon examination.  He did not remove the spinal cord because the CT scan showed the neck to be normal and there was no clinical indication of a neck injury.  Dr. Josselson testified that a fall from a bed could not have caused all of Alexis's injuries, and the vast majority of forensic pathologists agree that a child cannot die from a fall from a bed.  Police officers determined the bedroom where Alexis was injured was carpeted, and the top of the bed measured two feet three inches from the floor.

   Detective Philip Silva of the Vallejo Police Department spoke with Heredia about the incident on October 23, 2003.  Heredia said there had been an accident and Alexis had fallen off a bed.  The only other people at home were Heredia and his two children, ages four and three; Heredia's wife was at work when the injury happened.  Heredia explained that his son was ill and he had stayed home from work for the past four days to take care of the children.  When asked if he had ever hit Alexis, Heredia said he had spanked her on the bottom with a belt two nights earlier as punishment because she urinated while at the dinner table.  He said the child had problems with potty training and frequently had accidents.  Heredia stated that he used a belt "on a fairly regular basis" for discipline, but he admitted he got "carried away" during this recent spanking.  When he was shown photographs and asked about the bruising and marks on Alexis's head and body, Heredia either denied that the bruises were present, saying he could not see them, or claimed Alexis already had them when she came to live with him.  Although he denied slapping or punching Alexis in the head, Heredia admitted he once "popped her" in the mouth when she said a bad word.  Heredia said he also used the belt to discipline his own children, but Detective Silva saw no signs of bruising or abuse on them.

   Heredia told the police that on the afternoon of October 23, 2003, the children were bouncing on the bed and he went into the bedroom to make them stop.  He said he picked up his son and set him down on the ground and then reached to pick up his daughter.  As he did so, Alexis was bouncing across the bed.  Heredia said he was playing with his daughter and did not actually see Alexis fall, but when he looked he saw Alexis lying on her back with her head facing a dresser.  Her eyes were open and

5

> she did not appear to be breathing. Heredia said it "looked like she was gasping," and he thought she was playing. When he realized the child was unconscious, he carried her into the living room. Then he called his wife and 911 and also started CPR on the girl. Heredia said he believed Alexis had hit her head on the dresser or windowsill, but the police found no dents or markings on these areas indicating this happened. Heredia told the police Alexis was a very clumsy child and had injured herself several times in his home. For example, once Alexis was taking a shower, and after Heredia had left the room she slipped and fell flat on her face, injuring her nose. Other times, she tripped and fell in the garage and on the front brick steps. Heredia also told the officers Alexis had several injuries when he got her from her mother, including extensive bruising and burn marks on her ankles, and she also had lice in her hair. He showed the officers a bill for her treatment and said Alexis needed medical attention because she had been abused by her mother and was "not all there."

The court then outlined the defense case:

> Stacey Jolly saw Alvarez and Alexis frequently during the spring and summer of 2003. Once, near the end of July 2003, Jolley saw Alexis crying hysterically. When Jolley asked what was wrong, Alexis showed her marks she had across her bottom, lower back, and upper thighs.
> Alvarez's stepmother, Yolanda Wiegers, testified that Alvarez had a poor reputation for honesty and she believed Alvarez was a compulsive liar. Wiegers noticed Alexis was clumsy at times, but she thought it was due to Alexis's young age and she believed Alexis was a bright child. Alexis had very pale skin that showed bruises intensely, but Wiegers did not see any bruising on the child in August 2003, before she left to live with Heredia.
> The defense also presented expert testimony from Dr. Janice Ophoven, a pediatric and forensic pathologist with the medical examiner's office of St. Louis County in Minnesota. Dr. Ophoven testified that the slides she received from Dr. Josselson's autopsy were inadequate. Although there were sections of abnormal scalp and abnormal dura, slides of brain tissue itself were normal. In Dr. Ophoven's opinion, the finding of normal brain tissue was inconsistent with the conclusion that Alexis died from brain damage due to blunt force trauma. In a death induced by head trauma, she would expect to see physical damage to the brain tissue itself. She testified that the drug mannitol could not erase all traces of swelling; even if mannitol caused a temporary reduction in swelling, she explained, one would still see damage to areas of the brain where herniation had occurred. Mannitol would cause a temporary reduction in swelling, but "as long as there's circulation to the brain, the water is going to go back." Based on Heredia's description to the police about how Alexis appeared after she fell from the bed, Dr. Ophoven said she would have investigated both head trauma and the possibility of an injury to the upper spinal cord. There was a normal CT scan of the cervical spine in this case, but Dr. Ophoven thought the scan was incomplete and noted CT scans are not necessarily able to diagnose the type of spinal cord injury Alexis may have sustained. Given the autopsy finding of a normal brain, Dr. Ophoven would have investigated whether the cause of death was

injury to the cervical spine instead of brain damage. However, she conceded that whichever was the actual mechanism of death (i.e., cervical spine injury or brain damage), the event that caused the blunt force trauma to Alexis's head is what killed her. She also agreed there was no doubt Alexis had suffered abusive injuries to her body.

Neuropathology expert Roscoe Atkinson also testified that the autopsy findings did not support a conclusion that Alexis died of a blunt force head injury. Although the subdural hematoma indicated she suffered some type of head trauma, it was not extensive enough to have caused her death. If she had suffered a blow to the head so strong that she died as a result of brain swelling Dr. Atkinson would expect to find herniation in the brain at autopsy, yet there was no evidence of it in this case. Moreover, because the effect of mannitol only lasts for four hours, it could not be responsible for the normal brain size observed at autopsy. Atkinson also consulted with a radiologist and believed the CT scan taken at Children's Hospital did not show extensive cerebral edema. An injury to the cervical spine, however, could cause a person to stop breathing and Dr. Atkinson testified children's spinal cords are especially delicate. Assuming that Alexis injured herself in falling from a bed to a carpeted floor, Atkinson believed the autopsy findings and CT scans in this case would support a diagnosis of injury to the cervical spine.

### B. Procedural History

The state court recited the following procedural history:

> On July 18, 2005, the jury found Heredia guilty of second degree murder and assault on a child causing death. . . . The trial court denied probation and sentenced Heredia to 25 years to life imprisonment on the charge of assault causing death, with an additional sentence of 15 years to life imposed for the murder charge but stayed. . . . The court also ordered restitution of $10,000. . . and ordered victim restitution of $3,031.28.

The California Supreme Court declined direct review on March 12, 2008.

Petitioner filed a state habeas petition in the Solano County Superior Court. In denying relief, the court stated:

> The Court has read and considered the petition for writ of habeas corpus filed in the above-entitled matter on May 28, 2009, by Aaron Heredia (Petitioner), an inmate at Mule Creek State Prison. Petitioner asks the Court to review the facts of his 2006 conviction in case VCR170257. Petitioner was convicted of murder and assault on a child resulting in death, violation of Penal Code §§ 187 and 273ab. He feels that the victim's anemia may explain the bruising on the victim, which the prosecution used at trial as evidence of child abuse. He also wants the Court to review whether the hospital's emergency use of the drug mannitol caused the victim's death. Doctors at Oakland Children's Hospital used mannitol to reduce the trauma-induced brain swelling of the victim.

> Lastly, he alleges that his trial attorney committed ineffective assistance of counsel by not moving promptly to preserve the victim's body for autopsy, not using the anemia or mannitol as a defense, and by not removing a police officer from the jury.
> 
> Petitioner has failed to state a prima facie case for relief. (*People v. Duvall* (1995) 9 Cal.4th 464). Concerning his request for the Court to review his case, he must first state facts and legal theories entitling him to relief. He merely presents an alternative explanation of the facts which supposes that he is not guilty. The Court has no power to set aside the jury findings of guilty absent legal grounds. Also, Petitioner has not shown that his trial counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that any deficient performance was prejudicial. (citation omitted). Petitioner does not show that a more favorable outcome of his case was reasonably probable had his trial attorney taken any of the actions he asserts.

The California Court of Appeal denied habeas relief on September 10, 2009, and the California Supreme Court did likewise on March 10, 2010.

## II. STANDARDS OF REVIEW

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable. See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998). The AEDPA does not, however, apply in all circumstances. When it is clear that a state court has not reached the merits of a petitioner's claim, because it was not raised in state court or because the court denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal habeas court must review the claim de novo. See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach petitioner's claim under its "re-litigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing petition de novo where state court had issued a ruling on the merits of a related claim, but not the

claim alleged by petitioner).  When the state court does not reach the merits of a claim, "concerns about comity and federalism . . . do not exist." Pirtle, 313 F. 3d at 1167.

Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under § 2254(d)(1), federal habeas relief is available only where the state court's decision is "contrary to" or represents an "unreasonable application of" clearly established law.  Under both standards, "clearly established law" means those holdings of the United States Supreme Court as of the time of the relevant state court decision.  See Carey v. Musladin, 549 U.S. 70, 74 (2006) (citing Williams, 529 U.S. at 412) .  "What matters are the holdings of the Supreme Court, not the holdings of lower federal courts." Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2008) (en banc).  Supreme Court precedent is not clearly established law, and therefore federal habeas relief is unavailable, unless it "squarely addresses" an issue.  See Moses v. Payne, 555 F.3d 742, 753-54 (9th Cir. 2009) (citing Wright v. Van Patten, 552 U.S. 120, 28 S. Ct. 743, 746 (2008)). For federal law to be clearly established, the Supreme Court must provide a "categorical answer" to the question before the state court.  See id.; see also Carey, 549 U.S. at 76-77 (holding that a state court's decision that a defendant was not prejudiced by spectators' conduct at trial was not contrary to, or an unreasonable application of, the Supreme Court's test for determining prejudice created by state conduct at trial because the Court had never applied the test to spectators' conduct).  Circuit court precedent may not be used to fill open questions in the Supreme Court's holdings.  See Carey, 549 U.S. at 74.

/ / /

In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the Court), the United States Supreme Court explained these different standards. A state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme Court on the same question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. See id. at 405. A state court decision is also "contrary to" established law if it applies a rule which contradicts the governing law set forth in Supreme Court cases. See id. In sum, the petitioner must demonstrate that Supreme Court precedent requires a contrary outcome because the state court applied the wrong legal rules. Thus, a state court decision applying the correct legal rule from Supreme Court cases to the facts of a particular case is not reviewed under the "contrary to" standard. See id. at 406. If a state court decision is "contrary to" clearly established law, it is reviewed to determine first whether it resulted in constitutional error. See Benn v. Lambert, 283 F.3d 1040, 1052 n.6 (9th Cir. 2002). If so, the next question is whether such error was structural, in which case federal habeas relief is warranted. See id. If the error was not structural, the final question is whether the error had a substantial and injurious effect on the verdict, or was harmless. See id.

State court decisions are reviewed under the far more deferential "unreasonable application of" standard where it identifies the correct legal rule from Supreme Court cases, but unreasonably applies the rule to the facts of a particular case. See Wiggins v. Smith, 539 U.S. 510, 520 (2003). While declining to rule on the issue, the Supreme Court in Williams, suggested that federal habeas relief may be available under this standard where the state court either unreasonably extends a legal principle to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. See Williams, 529 U.S. at 408-09. The Supreme Court has, however, made it clear that a state court decision is not an "unreasonable application of" controlling law simply because it is an erroneous or incorrect application of federal law. See id. at 410; see also Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003). An "unreasonable application of" controlling law cannot necessarily be found

even where the federal habeas court concludes that the state court decision is clearly erroneous. See Lockyer, 538 U.S. at 75-76. This is because "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." Id. at 75. As with state court decisions which are "contrary to" established federal law, where a state court decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless unavailable if the error was non-structural and harmless. See Benn, 283 F.3d at 1052 n.6.

The "unreasonable application of" standard also applies where the state court denies a claim without providing any reasoning whatsoever. See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000). Such decisions are considered adjudications on the merits and are, therefore, entitled to deference under the AEDPA. See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982. The federal habeas court assumes that state court applied the correct law and analyzes whether the state court's summary denial was based on an objectively unreasonable application of that law. See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

### III. DISCUSSION

In the amended petition, petitioner argues:

Claim 1   The state courts unreasonably applied the United States Supreme Court standards set forth in *California v. Trombetta* and *Arizona v. Youngblood* in upholding the trial court's denial of petitioner's *Trombetta-Youngblood* motion [to preserve the victim's body].

Claim 2   The state courts' determination that trial counsel did not render ineffective assistance of counsel by failing to seek a formal order to preserve Alexis's spinal cord constituted an objectively unreasonable application of the *Strickland* standard.

/ / /

/ / /

/ / /

/ / /

A.  **Motion to Preserve the Victim's Body**

Addressing this claim on direct appeal, the California Court of Appeal stated:

> Heredia filed an in limine motion to dismiss the case pursuant to *California v. Trombetta* (1984) 467 U.S. 479, due to the prosecution's failure to preserve Alexis's body for testing by defense experts. An autopsy was performed on October 24, 2003, the afternoon of Alexis's death. According to the motion, on November 3, 7, and 10, defense counsel asked the prosecutor assigned to the case to preserve the remains for examination by a forensic pathologist to be retained by the defense. On November 10, 2003, the Solano County Coroner advised defense counsel that the child's body had been taken to a mortuary. A supervisor at the mortuary informed counsel that the remains were scheduled to be disposed of on November 12 or 13, but the mortuary would preserve them if the district attorney requested. The assigned deputy district attorney declined to do so, noting that the brain and eyes and several tissue samples had been preserved for defense examination, and Alexis's body was cremated on November 12, 2003. Based on the opinions of a retained pathologist, Dr. Ophoven, Heredia argued Alexis's lungs and spinal cord had exculpatory value that should have been apparent at the time of autopsy, and the prosecution therefore had a duty to preserve this evidence for defense examination. The trial court denied the motion, concluding the exculpatory value of the body was not readily apparent; instead, the defense motion presented "basically a battle of the experts on the issue of cause of death." The court also found there was no proof of bad faith by the district attorney in failing to preserve the body. Heredia challenges these rulings on appeal.

The court then outlined the law concerning preservation of evidence. Under California v. Trombetta, 467 U.S. 479, 488 (1984), the government has a duty to preserve evidence that might be expected to play a significant role in a suspect's defense. For the duty to be triggered, the evidence must possess a readily apparent exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. See id. at 489. Where the defense argument is that the evidence could have been subjected to additional tests, the results of which might have exonerated the defendant, the defendant must show bad faith on the part of the government. See Arizona v. Youngblood, 488 U.S. 51, 57

///

///

///

(1988). The California Court of Appeal continued as follows:

> Substantial evidence supports the trial court's finding that the exculpatory value of Alexis's spinal cord and lungs was not apparent before her body was cremated. Alexis had no signs of brain activity when she arrived at Children's Hospital, and all of the physicians who treated her believed she had suffered a massive brain injury. The medical examiner found indications of blunt force head trauma during the autopsy and concurred with the treating doctors' conclusion that the child died from a brain injury. The examiner noted, "there was no clinical suspicion of any neck injury," and a CT scan showed no evidence of an injury to the spinal cord. Given the consistent opinions of the treating doctors and medical examiner that Alexis died of a head injury, the exculpatory value of other parts of her body was not so apparent that due process required the state to preserve them. Due process does not require the prosecution "to gather and collect everything which, with fortuitous foresight, might prove useful to the defense." (citation omitted). Moreover, although the second prong of *Trombetta* may have been met, in that bodily remains are "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means," (citation omitted), this fact is immaterial because "*Trombetta*'s two-prong test of materiality is in the conjunctive not the disjunctive, and both prongs must be met before an item can be classified as "constitutionally material." (citation omitted).
> 
> At most, the physical evidence sought by the defense was potentially useful, in that "if could have been subjected to tests, the results of which might have exonerated the defendant." (citation omitted). Again, however, substantial evidence supports the trial court's finding that the prosecution acted in good faith. Although defense counsel repeatedly requested that the body be preserved, it appears from the record that counsel had not yet retained a pathologist to examine the body when these requests were made. Nor did Heredia seek a court order to preserve the remains until he could retain such an expert. . . . The prosecutor assured defense counsel that the brain and eyes and tissue samples preserved from the body would provide adequate material for examination by a defense pathologist. The defense did not request that specific other materials be preserved, and at the time – before defense experts pointed out possible causes of death other than brain injury – there was no reason for the prosecutor to think preservation of additional body parts was necessary. Accordingly, there was no due process violation, and the trial court properly denied Heredia's motion to dismiss.

Petitioner concedes that "the remains were only potentially exculpatory" and argues under Youngblood that the state court's conclusion that the prosecutor did not act in bad faith is not supported by the record. In support of this argument, petitioner states: "It seems apparent that the district attorney . . . made no attempt to confer with Dr. Josselson or determine if a fair sampling of the remains existed." Petitioner, however, cites no support in the record for

this argument.  In order to show bad fath under the facts of this case, petitioner must demonstrate that the prosecutor failed to request that the mortuary preserve the victim's body in order to prevent disclosure of evidence favorable to the defense.  See Phillips v. Woodford, 267 F.3d 966, 986 (9th Cir. 2001).  As respondent notes, the relevant inquiry focuses on the prosecutor's knowledge of the potentially exculpatory value of the evidence at the time it was destroyed.  See Youngblood, 488 U.S. at 56.

At issue in this case is the victim's spinal cord, which petitioner contends could have been examined for evidence to support his theory that Alexis' death was caused by an accidental fall.  Dr. Josselson, however, found no injury to the neck upon examination, and he did not remove the spinal cord because the CT scan showed the neck to be normal and there was no clinical indication of a neck injury consistent with an accidental fall.  In deciding what to do with the victim's remains, the record reflects that the prosecutor in fact preserved portions of the body which evidence at the time suggested were related to the cause of death.  Again, no evidence available to the prosecutor at the time indicated spinal cord trauma as the cause of death.  Further, at the time the body was destroyed, petitioner's counsel had not retained any medical experts who could have examined the remains.  Rather than indicating that the prosecutor declined counsel's request to preserve the remains in order to prevent exculpatory evidence from coming to light, the record shows that the prosecutor acted in good faith based on the evidence available at the time, which did not point to the spinal cord.

Even if there is constitutional error, non-structural errors may be considered harmless.  See Hedgpeth v. Pulido, 129 S.Ct. 530, 532 (2008) (per curiam) (citing Chapman v. California, 386 U.S. 18 (1967)).  Constitutional errors fall into one of two categories – trial errors or structural errors.  See Brecht v. Abrahamson, 507 U.S. 619, 629 (1993).  Trial error "occur[s] during the presentation of the case to the jury" and "may . . . be quantitatively assessed in the context of other evidence presented in order to determine" its effect on the trial.  Arizona v. Fulminante, 499 U.S. 279, 307-08 (1991).  Structural errors, on the other end of the spectrum,

relate to trial mechanism and infect the entire trial process. See id. at 309-10.  Denial of the right to counsel is an example of a structural error.  See Brecht, 507 U.S. at 629-30 (citing Gideon v. Wainwright, 372 U.S. 335 (1963)).  Improperly impeaching a defendant based on his silence after receiving Miranda warnings, however, is a trial error.  See Brecht, 507 U.S. 629 (citing Doyle v. Ohio, 426 U.S. 610 (1976)).  Structural errors to which the harmless error analysis does not apply are the "exception and not the rule"  See Rose v. Clark, 478 U.S. 570, 578 (1986).

In Chapman, a case before the Supreme Court on direct review, the Court held that "before a [non-structural] constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. at 24.  A different harmless error standard applies to cases on collateral review.  In Brecht, the Court stated that applying the Chapman standard on collateral review "undermines the States' interest in finality and infringes upon their sovereignty over criminal matters." 507 U.S. at 637.  The Court also noted that the Chapman standard is at odds with the historic meaning of habeas corpus – which is meant to afford relief only to those who have been grievously wronged – because it would require relief where there is only a reasonable possibility that a constitutional error contributed to the verdict.  See id.  Therefore, in habeas cases, the standard applied in Kotteakos v. United States, 328 U.S. 750 (1946), governs harmless error analysis for non-structural constitutional errors.  See Brecht, 507 U.S. at 637.  Under this standard, relief is available where non-structural error occurs only where such error "had a substantial and injurious effect or influence in determining the jury's verdict." Kotteakos, 328 U.S. at 776.

Here, the alleged error is non-structural in that it pertains to the preservation of evidence.  In addition, because this is a case on collateral review, the "substantial and injurious effect" standard applies.  Under this standard, the court finds any error to be harmless.  Specifically, petitioner has not demonstrated that the alleged error had a substantial and injurious effect on the outcome of the trial.  While petitioner contends that his experts would have testified that spinal cord injury was the cause of death had they been able to examine the spinal cord, such

1  evidence is only speculative because it was impossible for the defense experts to know what the
2  spinal cord would show.  Opposing this speculative evidence, the prosecution expert opinions all
3  pointed to petitioner's guilt.  Further, even had the spinal cord been preserved and examined by
4  defense experts, and had the results of those examinations suggested a spinal cord injury as the
5  cause of death, the jury would still have been presented with the prosecution experts who
6  concluded that petitioner caused Alexis' death.  At best, the case would have turned to a battle of
7  the experts, and there is no indication in the record that, had such a battle occurred, the jury
8  would likely have found in favor of petitioner.  In other words, the jury could still have rejected
9  petitioner's theory in favor of the prosecution's theory, and petitioner has not demonstrated that
10 there was any substantial likelihood that the jury would not have done so had the evidence been
11 preserved and examined by his experts.
12         In sum, the court concludes that no error occurred because petitioner has not met
13 his burden of showing that the prosecutor acted in bad faith and, even if error occurred, it was
14 harmless.

### B.   Ineffective Assistance of Counsel

16         The Sixth Amendment guarantees the effective assistance of counsel.  The United
17 States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in
18 Strickland v. Washington, 466 U.S. 668 (1984).  First, a petitioner must show that, considering
19 all the circumstances, counsel's performance fell below an objective standard of reasonableness.
20 See id. at 688.  To this end, petitioner must identify the acts or omissions that are alleged not to
21 have been the result of reasonable professional judgment.  See id. at 690.  The federal court must
22 then determine whether, in light of all the circumstances, the identified acts or omissions were
23 outside the wide range of professional competent assistance.  See id.  In making this
24 determination, however, there is a strong presumption "that counsel's conduct was within the
25 wide range of reasonable assistance, and that he exercised acceptable professional judgment in all
26 significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing

Strickland, 466 U.S. at 689).

Second, a petitioner must affirmatively prove prejudice. See Strickland, 466 U.S. at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.; see also Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000). A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

As discussed above, any error which occurred with respect to destruction of Alexis' body was harmless. Similarly, any deficient performance on the part of counsel in failing to make a formal motion to preserve the body did not result in prejudice because petitioner cannot demonstrate that, had counsel made a formal motion the motion would have been granted or, even had it been granted, that there is a reasonable probability of a different outcome. Ultimately, had the motion been granted and the evidence preserved and examined by defense experts, the jury would still have been free to reject such testimony in favor of the prosecution experts.

Moreover, the court agrees with respondent that counsel's performance was not deficient in the first place. Here, counsel made the tactical decision to seek preservation of Alexis' body through informal channels. Petitioner has not shown that this decision to seek informal relief as opposed to formal relief via a motion was unreasonable. Further, given that petitioner concedes that the exculpatory nature of the evidence was not readily apparent, and because there is no evidence that the prosecutor acted in bad faith based on what was known at the time the body was cremated, it is unlikely that any formal motion to preserve Alexis' body would have been granted.

In sum, the court finds that counsel's performance was not deficient and, even if it was, no prejudice occurred.

### IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that petitioner's amended petition for a writ of habeas corpus (Doc. 42) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court.  Responses to objections shall be filed within 14 days after service of objections.  Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  February 13, 2013

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE